UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

05 10521

SANDRA WIESNER,
            Plaintiff        )
                             )
                             )
VS.                          )          **CIVIL ACTION**
                             )      NEW NO.
JEFFERSON PILOT FINANCIAL    )
INSURANCE COMPANY,    MAGISTRATE JUDGE
            Defendant    )

RECEIPT # 62888
AMOUNT $
SUMMONS ISSUED
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK.
DATE

<u>**COMPLAINT**</u>

**PARTIES**

1.    The Plaintiff, **SANDRA WIESNER** , is an adult individual, born January 1,

      1956, and is a resident of the Town of Bourne, Barnstable County, Massachusetts.

2.    The Defendant, **JEFFERSON PILOT FINANCIAL INSURANCE COMPANY,**

      is a business corporation engaged in the business of insurance, with a principal place

      of business in the City of Greensboro, North Carolina, and is registered and/or

      licensed as such with the Massachusetts Division of Insurance, NAIC No. 70254.

**DECLARATION OF FACTS**

3.    At all times relevant, prior to and including January 31, 2001, the Plaintiff was an

      employee of the Town of Falmouth, School Department (Falmouth Public Schools),

      working as a public school teacher, earning $1,975 per week before taxes.

4.    As of January 31, 2001, and at all times relevant thereafter, the Defendant was

      engaged I the business of insurance in the Commonwealth of Massachusetts, and

was providing group long term disability (LTD) coverage for employees of the

Falmouth Public Schools, under Policy No. 000010030695, effective July 1,

2001.  (A true copy of said group LTD policy is attached hereto as Exhibit A).

5.    The Falmouth Public Schools' LTD policy was part of an employee-benefit plan

as that term is used in 29 U.S.C. Sect. 1001, et seq., known as the Employee

Retirement Income Security Act (ERISA), and the administration, interpretation

and enforcement of said LTD policy are subject to the terms of the ERISA statute.

6.    As of January 31, 2001, and at all times relevant thereafter, the Plaintiff Sandra

Wiesner was an eligible employee under the Falmouth Public Schools' group

LTD policy.

7.    The aforesaid Policy No. 000010030695 (Exhibit A attached hereto), sets forth

the rights and obligations of the both the Plaintiff and the Defendant under the

long term disability coverage provided by the Defendant to employees of the

Falmouth Public Schools.

8.    The disability coverage provided by Defendant  under said LTD policy includes

an own-occupation disability benefit for the first 24 months of disability preventing

the employee from performing the material duties of her regular occupation, subject

to a 180-day elimination period, and a continuing benefit after such 24 months of

own-occupation disability where the employee is prevented from performing any

occupation for which she may be reasonably qualified by training, education or

experience.

9.    The employee's benefit under the Falmouth Public Schools' group LTD plan

is calculated at sixty percent (60%) of basic monthly earnings.

10.  An eligible employee under the Falmouth Public Schools' LTD plan is entitled
     to benefits after the end of the elimination period upon submission of proof to
     the Defendant that she is disabled due to sickness and requires the regular
     attendance of a physician.

11.  Over a period of several years prior to January 31, 2001, the Plaintiff began to
     suffer from progressive symptoms including chronic fatigue, weakness, low
     stamina, sleep disturbance and cognitive impairment. The medical condition
     which accounted for such symptoms was diagnosed by Plaintiff's attending
     physicians as fibromyalgia.

12.  By reason of such progressive symptoms of fibromyalgia, Plaintiff took a leave of
     absence beginning on January 31, 2001, while remaining enrolled as an employee of
     the Falmouth Public Schools.

13.  By December 2001, it became apparent that Plaintiff could not return to
     work due to total and permanent disability, and she filed her claim with the Defendant
     for long term disability benefits on December 18, 2001, under the Falmouth Public
     Schools' LTD plan. (A true copy of Plaintiff's disability claim is attached hereto
     as Exhibit B).

14.  In support of her claim for long term disability benefits, Plaintiff submitted the
     medical records and reports from her treating physicians which establish by
     substantial evidence that Plaintiff suffers from symptoms of fibromyalgia which are
     disabling and prevent her from working as a teacher or in any other occupation for
     which she may be qualified by education, training or experience and is therefore
     "totally disabled" within the meaning of the Falmouth Public Schools' LTD plan.

15.  On August 2, 2002, the Defendant denied Plaintiff's LTD claim, and that denial was unsupported by substantial evidence and was contrary to the substantial medical evidence submitted by the Plaintiff.

16.  On January 27, 2003, Plaintiff submitted her second level appeal from Defendant's denial of her LTD claim, together with further substantial medical evidence which confirmed her total disability due to the symptoms of fibromyalgia.  (A true copy of Plaintiff's written request for review is attached hereto as Exhibit C).

18.  On December 2, 2003, Defendant again denied Plaintiff's LTD claim which was a final denial with no further administrative review.

19.  Defendant's denial of Plaintiff's LTD claim was arbitrary and capricious, was not supported by substantial evidence and was contrary to the substantial medical and vocational evidence of record.

**COUNT I:    BREACH OF CONTRACT**

19.  By reason of the matters stated in Paragraphs 1 through 19, the Defendant has breached its contractual obligations to the Plaintiff under the Falmouth Public Schools' LTD plan, and they are liable therefore, as provided by 29 U.S.C. Sect. 1132(a)(1)(B), for all benefits payable to Plaintiff for the period from January 1, 2001, through the present, plus interest, costs and attorneys fees.

**COUNT II:   WRONGFUL CLAIM DENIAL UNDER ERISA**

20.  By reason of the matters stated in Paragraphs 1 through 19, the Defendant has wrongfully and unreasonably denied LTD benefits under the Falmouth Public Schools' LTD plan, in violation of ERISA, 29 U.S.C. Sect. 1132(a)(1)(B) and Sect.

4

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

SANDRA WIESNER

## DEFENDANTS

JEFFERSON PILOT FINANCIAL OFFICE
INSURANCE COMPANY

FILED

2005 MAR 14 P 3: 24

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Barnstable
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED. DISTRICT OF MASS

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Richard K. Latimer/Kistin Babitsky
Latimer & Beitman, Box 590, 13 Falmouth
Heights Road, Falmouth, MA 02541-0590
(508) 540-1606

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only) AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury — Med. Malpractice<br>☐ 365 Personal Injury — Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br>**SOCIAL SECURITY** | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act<br>☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights | **PRISONER PETITIONS**<br>☐ 510 Motions to Vacate Sentence<br>**HABEAS CORPUS:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☒ 791 Empl. Ret. Inc. Security Act | ☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DWC/DWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS — Third Party 26 USC 7609 | |

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

29 U.S.C. Sect. 1001, et seq., ERISA
Wrongful denial of disability claim

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ YES ☒ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE _____  DOCKET NUMBER _____

DATE  3/10/05

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. **TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY)**_____

SANDRA WIESNER v. JEFFERSON PILOT FINANCIAL INSURANCE COMPANY

2. **CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE CIVIL COVER SHEET. (SEE LOCAL RULE 40.1(A)(1)).**

  ___   I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

  XX   II.   195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730, 740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.    *Also complete AO 120 or AO 121 for patent, trademark or copyright cases

  ___   III.   110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, 380, 385, 450, 891.

  ___   IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900.

  ___   V.   150, 152, 153.

3. **TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(E)).**

  _____

4. **HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS COURT?**    YES ☐   NO ☒

5. **DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE PUBLIC INTEREST? (SEE 28 USC 2403)**    YES ☐   NO ☒
  IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY?    YES ☐   NO ☐

6. **IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE 28 USC 2284?**    YES ☐   NO ☒

7. **DO ALL PARTIES IN THIS ACTION RESIDE IN THE CENTRAL SECTION OF THE DISTRICT OF MASSACHUSETTS (WORCESTER COUNTY) - (SEE LOCAL RULE 40.1(C)).**    YES ☒   NO ☐
  OR IN THE WESTERN SECTION (BERKSHIRE, FRANKLIN, HAMPDEN OR HAMPSHIRE COUNTIES) - (SEE LOCAL RULE 40.1(D)).    YES ☐   NO ☐

8. **DO ALL OF THE PARTIES RESIDING IN MASSACHUSETTS RESIDE IN THE CENTRAL AND/OR WESTERN SECTIONS OF THE DISTRICT?**    YES ☐   NO ☐
  (a)   IF YES, IN WHICH SECTION DOES THE PLAINTIFF RESIDE?_____

9. **IN WHICH SECTION DO THE ONLY PARTIES RESIDING IN MASSACHUSETTS RESIDE?** Eastern

10. **IF ANY OF THE PARTIES ARE THE UNITED STATES, COMMONWEALTH OF MASSACHUSETTS, OR ANY GOVERNMENTAL AGENCY OF THE U.S.A. OR THE COMMONWEALTH, DO ALL OTHER PARTIES RESIDE IN THE CENTRAL SECTION: YES ☐ NO ☐    OR WESTERN SECTION: YES ☐ NO ☐**

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME Richard K. Latimer/Kistin Babitsky Latimer & Beitman

ADDRESS Box 590, 13 Falmouth Heights Road, Falmouth, MA 02541

TELEPHONE NO. (508) 540-1606

(Categform.rev - 3/97)



**JEFFERSON PILOT FINANCIAL**

**Jefferson Pilot Financial Insurance Company**
8801 Indian Hills Drive, Omaha NE 68114-4066
(402) 361-7300        A Stock Company

In Consideration of the application for this Policy made by

<u>Town of Falmouth</u>

(herein called the Policyholder)

and the payment of all premiums when due, Jefferson Pilot Financial Insurance Company agrees to make the payments provided in this Policy to the person or persons entitled to them.

Policy No.    000010030695        Policy Effective Date:    July 1, 2000

Monthly Premium: .96% of Total Covered Payroll per Month

The above rate is guaranteed until July 1, 2003, unless any of the Policy's terms are changed.

Policy Anniversaries will be annually beginning on:  July 1, 2003

The first premium is due on the Policy's Effective Date, and subsequent premiums are due on August 1, 2000, and on the same day of each month thereafter.

The Policy is delivered in the state of Massachusetts and subject to the laws of that jurisdiction.

Jefferson Pilot Financial Insurance Company has executed this Policy at its Home Office in Omaha, Nebraska this 15th day of May, 2001.

Chief Executive Officer

Secretary

## GROUP LONG TERM DISABILITY INSURANCE POLICY

# TABLE OF CONTENTS

Schedule of Benefits .................................................................................................3

Definitions...............................................................................................................4

General Provisions ..................................................................................................9

Claims Procedures ................................................................................................11

Eligibility ..............................................................................................................13

Effective Dates......................................................................................................13

Individual Termination .........................................................................................15

Policy Termination................................................................................................16

Premiums and Premium Rates ..............................................................................17

Total Disability Monthly Benefit .........................................................................18

Partial Disability Monthly Benefit .......................................................................19

Other Income Benefits ..........................................................................................21

Recurrent Disability..............................................................................................22

Exclusions.............................................................................................................23

Specified Injuries or Sicknesses Limitation.........................................................24

Voluntary Vocational Rehabilitation Benefit Provision ......................................25

Reasonable Accommodation Benefit....................................................................26

Prior Insurance Credit Upon Transfer of Insurance Carriers ..............................27

Family Income Benefit..........................................................................................28

GL3001-LTD-2

05/01/01

## SCHEDULE OF BENEFITS

ELIGIBLE CLASS means:  Class 1    All Full-Time Employees

MINIMUM HOURS PER WEEK:  20

BENEFIT PERCENTAGE:   60%

MAXIMUM MONTHLY BENEFIT:   $1,500

MINIMUM MONTHLY BENEFIT:    $50

Benefits for PRE-EXISTING CONDITIONS will be subject to the Pre-Existing Condition Exclusion on the Exclusion page.

ELIMINATION PERIOD:  90 days of Disability due to the same or a related Sickness or Injury, which must be accumulated within a 180 day period.

MAXIMUM BENEFIT PERIOD (For Sickness or Injury):  The Insured Employee's Social Security Normal Retirement Age, or the Maximum Benefit Period shown below (whichever is later).

| Age at Disability | Maximum Benefit Period |
|---|---|
| Less than Age 60 | To Age 65 |
| 60 | 60 months |
| 61 | 48 months |
| 62 | 42 months |
| 63 | 36 months |
| 64 | 30 months |
| 65 | 24 months |
| 66 | 21 months |
| 67 | 18 months |
| 68 | 15 months |
| 69 and Over | 12 months |

OWN OCCUPATION PERIOD means a period beginning at the end of the Elimination Period and ending 24 months later for Insured Employees.

WAITING PERIOD:    None  (For date insurance begins, refer to "Effective Dates" section)

CONTRIBUTIONS:    Insured employees are required to contribute to the cost of the coverage.

GL3001-LTD-SB

3

05/01/01

## DEFINITIONS

As used throughout this Policy, the following terms shall have the meanings indicated below. Other parts of this Policy contain definitions specific to those provisions.

**ACTIVE WORK** or **ACTIVELY-AT-WORK** means an Employee's full-time performance of all main duties of such Employee's occupation at:
1. the Employer's usual place of business; or
2. any other business location to which the Employer requires the Employee to travel.

Unless Disabled on the prior workday or on the day of absence, an Employee will be considered Actively at Work on the following days:
1. a Saturday, Sunday or holiday which is not a scheduled workday;
2. a paid vacation day or other scheduled or unscheduled non-workday; or
3. an excused or emergency leave of absence (except a medical leave) of 30 days or less.

**ANNUAL SALARY** means the Insured Employee's Basic Monthly Earnings or Predisability Income multiplied by 12.

**BASIC MONTHLY EARNINGS** or **PREDISABILITY INCOME** means the Insured Employee's average monthly base salary or hourly pay from the Employer before taxes on the determination date. The determination date is the last day worked just prior to the date the Disability begins.

It also includes:
1. commissions averaged over the 12 months just prior to the determination date or over the actual period of employment with the Employer just prior to that date, if shorter.

It does **not** include bonuses, overtime pay, or any other extra compensation. It does **not** include income from a source other than the Employer. It will not exceed the amount shown in the Employer's financial records, the amount for which premium has been paid, or the maximum covered earnings permitted by this Policy; whichever is less.

**COMPANY** means Jefferson Pilot Financial Insurance Company, a Nebraska corporation, whose Home Office address is 8801 Indian Hills Drive, Omaha, Nebraska 68114.

# DEFINITIONS
## (continued)

**DAY** or **DATE** means the period of time which begins at 12:01 a.m. and ends at 12:00 midnight, standard time, at the Policyholder's place of business. When used with regard to effective dates, it means 12:01 a.m. When used with regard to termination dates, it means 12:00 midnight.

**DISABLED** or **DISABILITY** means Totally Disabled and/or Partially Disabled.

**DISABILITY BENEFIT** when used with the term Retirement Plan, means a benefit which:
1.  is payable under a Retirement Plan due to disability as defined in that plan; and
2.  does not reduce the benefits which would have been paid as Retirement Benefits at the normal retirement age under the plan if the disability had not occurred.

If the payment of the benefit does cause such a reduction, the benefit will be deemed a Retirement Benefit as defined in this Policy.

**ELIGIBILITY WAITING PERIOD** means the period of time that:
1.  begins with an Employee's most recent date of employment with the Employer; and
2.  ends on the day prior to the day such Employee is eligible for coverage under this Policy.

**ELIMINATION PERIOD** means the number of days of Disability during which no benefit is payable. The Elimination Period is shown in the Schedule of Benefits. It applies as follows.
1.  The Elimination Period:
    (a)  begins on the first day of Disability; and
    (b)  is satisfied when the required number of days is accumulated within a period which does not exceed two times the Elimination Period.
    During a period of Disability, the Insured Employee may return to full-time work, at his or her own or any other occupation, for an accumulated number of days not to exceed the Elimination Period.
2.  Only days of Disability due to the same or a related Sickness or Injury will count towards the Elimination Period. Days on which the Insured Employee returns to full-time work will not count towards the Elimination Period.

**EMPLOYEE** means a person:
1.  whose employment with the Employer is:
    (a)  on a regular full-time basis;
    (b)  the person's principal occupation; and
    (c)  for regular wage or salary;
2.  who is regularly scheduled to work at such occupation at least the minimum number of hours shown in the Schedule of Benefits; and
3.  who is a member of an Eligible Class which is eligible for coverage under this Policy;
4.  who is not a temporary or seasonal employee; and
5.  who is a citizen of the United States or legally works in the United States.

**EMPLOYER** means the Policyholder and includes any division, subsidiary or affiliated company named in the Application.

**EVIDENCE OF INSURABILITY** means a statement of proof of an Employee's medical history. The Company uses this to determine his or her acceptance for insurance, or for an increased amount of insurance. Such proof will be provided at the Employee's own expense.

GL3001-LTD-3A 98

Residual Partial
05/01/01

### DEFINITIONS
### (continued)

**FAMILY OR MEDICAL LEAVE** means a leave of absence which is approved in writing by the Employer; and which is subject to:

1. the federal Family and Medical Leave Act of 1993, and any amendments to it; or
2. any similar state law requiring the Employer to grant family or medical leaves.

**INSURED EMPLOYEE** means an Employee for whom Policy coverage is in effect.

**INJURY** means bodily injury which is caused by and results directly from an accident, independently of all other causes. For purposes of determining benefits under this Policy, a Disability will be considered due to an Injury only if:

1. the Disability begins within 90 days after the Injury; or
2. the Injury occurred while the Employee was insured under this Policy.

The term "Injury" shall **not** include any:

1. condition to which a physical or mental sickness, the natural progression of a sickness, or the treatment of a sickness is a substantial contributing factor (based upon the preponderance of medical evidence);
2. condition caused solely by emotional stress or mental trauma;
3. repetitive trauma condition which results from repetitious, physically traumatic activities that occur over time;
4. pregnancy; except for complications which result from a covered Injury;
5. condition caused by infection; except pyogenic bacterial infection of a covered Injury; or
6. condition caused by medical or surgical treatment; except when the treatment is needed solely because of a covered Injury.

GL3001-LTD-4 98

6

05/01/01

## DEFINITIONS
### (continued)

**MAIN DUTIES** or **MATERIAL AND SUBSTANTIAL DUTIES** means those job duties which:
1. are normally required to perform the Insured Person's regular occupation; and
2. cannot reasonably be modified or omitted.

It includes those main duties as performed in the national workforce; **not** as performed for a certain firm or at a certain work site.

**MEDICALLY APPROPRIATE TREATMENT** means diagnostic services, consultation, care or services which are consistent with the symptoms or diagnosis causing the Insured Employee's Disability. Such treatment must be rendered:
1. by a Physician whose license and any specialty are consistent with the disabling condition; and
2. according to generally accepted, professionally recognized standards of medical practice.

**MONTHLY BENEFIT** means the amount payable monthly by the Company to the Insured Employee who is Totally or Partially Disabled.

**OWN OCCUPATION PERIOD** means a period as shown in the Schedule of Benefits.

**PARTIALLY DISABLED** or **PARTIAL DISABILITY** shall be as defined in the Partial Disability Monthly Benefit sections.

**PARTIAL DISABILITY EMPLOYMENT** means the Insured Employee is working at his or her own or any other occupation; but because of a Partial Disability:
1. the Insured Employee's hours or production is reduced;
2. one or more main duties of the job are reassigned; or
3. the Insured Employee is working in a lower-paid occupation.

His or her current earnings must be at least 20% of Predisability Income, and may not exceed the percentage specified in the Partial Disability Benefit section.

**PHYSICIAN** means:
1. a legally qualified medical doctor who is licensed to practice medicine, to prescribe and administer drugs, or to perform surgery; or
2. any other duly licensed medical practitioner who is deemed by state law to be the same as a legally qualified medical doctor.

The medical doctor or other medical practitioner must be acting within the scope of his or her license; and must be qualified to provide medically appropriate treatment for the Insured Employee's disabling condition.

Physician does **not** include the Insured Employee or a relative of the Insured Employee receiving treatment. (Relatives include the Insured Employee's spouse, siblings, parents, children and grandparents; and his or her spouse's relatives of like degree.)

**POLICY** means this Group Long Term Disability Insurance Policy issued by the Company to the Policyholder.

**POLICYHOLDER** means the person, individual, firm, trust or other organization as shown on the Face Page of this Policy.

**PREDISABILITY INCOME** - See Basic Monthly Earnings.

GL3001-LTD-5 98

05/01/01

## DEFINITIONS
### (continued)

**REGULAR CARE OF A PHYSICIAN** or **REGULAR ATTENDANCE OF A PHYSICIAN** means the Insured Employee:

1. personally visits a Physician, as often as medically required according to standard medical practice to effectively manage and treat his or her disabling condition; and
2. receives medically appropriate treatment, by a Physician whose license and any specialty are consistent with the disabling condition.

**REGULAR OCCUPATION** or **OWN OCCUPATION** means the occupation, trade or profession:

1. in which the Insured Employee was employed with the Employer prior to Disability; and
2. which was his or her primary source of earned income prior to Disability.

It includes any work in the same occupation for pay or profit; whether such work is with the Employer, with some other firm or on a self-employed basis. It includes the main duties of that occupation as performed in the national workforce; **not** as performed for a certain firm or at a certain work site.

**RETIREMENT BENEFIT** when used with the term Retirement Plan, means a benefit which:

1. is payable under a Retirement Plan either in a lump sum or in the form of periodic payments;
2. does not represent contributions made by an Employee (payments which represent Employee contributions are deemed to be received over the Employee's expected remaining life regardless of when such payments are actually received); and
3. is payable upon:
   (a) early or normal retirement; or
   (b) disability, if the payment does reduce the benefit which would have been paid at the normal retirement age under the plan, if disability had not occurred.

**RETIREMENT PLAN** means a defined benefit or defined contribution plan which provides Retirement Benefits to Employees and which is not funded wholly by Employee contributions. The term shall **not** include any 401(k), profit-sharing or thrift plan; informal salary continuance plan; individual retirement account (IRA); tax sheltered annuity (TSA); stock ownership plan; or a non-qualified plan of deferred compensation. An Employer's Retirement Plan is deemed to include any Retirement Plan:

1. which is part of any federal, state, county, municipal or association retirement system; and
2. for which the Employee is eligible as a result of employment with the Employer.

**SICK LEAVE** or **ANY SALARY CONTINUANCE PLAN** means a plan which:

1. is established and maintained by the Employer for the benefit of Insured Employees; and
2. continues payment of all or part of an Insured Employee's Predisability Income for a specified period after he or she becomes Disabled.

It does **not** include compensation the Employer pays an Insured Employee for work actually performed during a Disability.

**SICKNESS** means illness, pregnancy or disease.

**TOTAL COVERED PAYROLL** means the total amount of Basic Monthly Earnings for all Employees insured under this Policy.

**TOTAL DISABILITY** or **TOTALLY DISABLED** shall be defined in the Total Disability Monthly Benefit section.

## GENERAL PROVISIONS

**ENTIRE CONTRACT.** The entire contract between the parties shall consist of:
1. this Policy and the Application (a copy of which is attached);
2. the Employer's Participation Agreement, if any; and
3. the Insured Employee's enrollment forms, if any.

In the absence of fraud, all statements made by the Policyholder and by Insured Employees are representations and not warranties. No statement made by an Insured Employee will be used to contest the coverage provided by this Policy; unless a copy of the statement has been furnished to such Insured Employee.

**AUTHORITY TO MAKE OR AMEND CONTRACT.** Only a Company Officer located in the Company's Home Office has the authority to:
1. determine the insurability of a group or any individual within a group;
2. make a contract in the Company's name;
3. amend or waive any provision of this Policy; or
4. extend the time for payment of any premium.

No change in this Policy will be valid; unless it is made in writing and signed by such a Company Officer.

**INCONTESTABILITY.** Except for the non-payment of premiums or fraud, the Company may not contest the validity of this Policy as to any Insured Employee, after it has been in force for two years during his or her lifetime.

**RESCISSION.** The Company has the right to rescind any insurance for which evidence of insurability was required, if:
1. an Insured Employee incurs a claim during the first two years of coverage; and
2. the Company discovers that the Insured Employee made a material misrepresentation on his or her enrollment form.

A material misrepresentation is an incomplete or untrue statement that caused the Company to issue coverage which it would have disapproved, had it known the truth. To rescind means to cancel insurance back to its effective date. In that event, the Company will refund all premium paid for the rescinded insurance, less any benefits paid for the Insured Employee's Disability. The Company reserves the right to recover any claims paid in excess of such premiums.

**NON-PARTICIPATION.** This is a non-participating Policy. It will not share in the divisible surplus of the Company.

**INFORMATION TO BE FURNISHED.** The Employer is required to furnish the Company any information needed to administer this Policy, including:
1. information about Employees who become eligible for insurance; whose amounts of coverage change; and whose eligibility or coverage ends;
2. occupational information and other facts that may be needed to manage a claim; and
3. any other information that the Company may reasonably require.

The Company may inspect any of the Employer's records which relate to this Policy, at any reasonable time.

Clerical error by the Employer:
1. will not affect insurance which otherwise would be in effect; and
2. will not continue insurance which otherwise would be terminated.

Once an error is discovered, an equitable adjustment in premium will be made. If a premium adjustment involves the return of unearned premium, the amount of the return will be limited to the 12-month period which precedes the date the Company receives proof that such an adjustment should be made.

GL3001-LTD-7 98

05/01/01

**GENERAL PROVISIONS**
**(continued)**

MISSTATEMENTS OF FACTS.  If relevant facts about any person were misstated:
1.    a fair adjustment of the premium will be made; and
2.    the true facts will decide if and in what amount insurance is valid under this Policy.
If an Insured Employee's age has been misstated; then any benefits shall be in the amount the paid premium would have purchased at the correct age.

ACTS OF THE POLICYHOLDER.  In administering this Policy, the Policyholder must:
1.    treat Employees the same in like situations; and
2.    allow the Company, without inquiry, to rely on its acts.

POLICYHOLDER'S AGENCY.  For all purposes of this Policy, the Policyholder acts on its own behalf or as Agent of the Employee.  Under no circumstances will the Policyholder be deemed the Agent of the Company.

COMPANY'S DISCRETIONARY AUTHORITY.  Except for those functions which this Policy specifically reserves to the Policyholder or Employer, the Company has sole authority to manage this Policy, to administer claims, to interpret Policy provisions, and to resolve questions arising under this Policy.  The Company's authority includes (but is not limited to) the right to:
1.    establish and enforce procedures for administering this Policy and claims under it;
2.    determine Employees' eligibility for insurance and entitlement to benefits;
3.    determine what information the Company reasonably requires to make such decisions; and
4.    resolve all matters when a claim review is requested.
Any decision the Company makes in the exercise of its authority shall be conclusive and binding.

CERTIFICATES.  The Employer will be furnished with individual Certificates for delivery to each Insured Employee.  These Certificates summarize the benefits provided by this Policy.  If there is a conflict between this Policy and the Certificate, this Policy will control.

CONFORMITY WITH STATE STATUTES.  If, on its effective date, any provision of this Policy conflicts with any applicable law; then the provision will be deemed to conform to the minimum requirements of the law.

CURRENCY.  In administering this Policy, all Predisability Income will be expressed in U.S. dollars; and all premium and benefit amounts must be paid in U.S. dollars.

WORKERS' COMPENSATION OR STATE DISABILITY INSURANCE.  This Policy does not replace or provide benefits required by Workers' Compensation laws or any state disability insurance plan laws.

ASSIGNMENT.  The rights and benefits under this Policy may not be assigned.

GL3001-LTD-7 98

05/01/01

## CLAIMS PROCEDURES

**NOTICE OF CLAIM.** Written notice of claim must be given during the Elimination Period. The notice must be sent to the Company's Home Office. It should include:

1. the Insured Employee's name and address; and
2. the number of this Policy.

If this is not possible, written notice must be given as soon as it is reasonably possible.

**CLAIM FORMS.** When notice of claim is received, the Company will send claim forms to the Insured Employee. If the Company does not send the forms within 15 days; then the Insured Employee may send the Company written proof of Disability in a letter stating the date the Disability started, its cause and degree. The Company will periodically send the Insured Employee additional Claim Forms.

**PROOF OF CLAIM.** The Company must be given written proof of claim within 90 days after the end of the Elimination Period. If it was not reasonably possible to give written proof in the time required, the claim will not be reduced or denied solely for this reason; provided the proof is filed as soon as reasonably possible. In any event, proof of claim must be given no later than one year from such time. These time limits will not apply while an Insured Employee lacks legal capacity, however.

Proof of claim must be provided at the Insured Employee's own expense. It must show the date the Disability started, its cause and degree. It must show any restrictions on performing the duties of the Insured Employee's regular occupation. Documentation must include:

1. completed statements by the Insured Employee, the Employer and the attending Physician;
2. a signed authorization for the Company to obtain more information; and
3. any other items the Company may reasonably require in support of the claim.

Proof of continued Disability and regular attendance of a Physician must be given to the Company, within 60 days after the Company requests it; if it is not, benefits may be denied or suspended.

**EXAM OR AUTOPSY.** At anytime while a claim is pending, the Company may:

1. have the Insured Employee examined by a Physician, specialist or vocational rehabilitation expert of the Company's choice, as often as reasonably required; and
2. deny or suspend benefits for an Insured Employee who fails to attend an exam, without good cause; or who fails to cooperate with the examiner.

The Company may also have an autopsy done, where it is not forbidden by law. Any such exam or autopsy will be at the Company's expense.

**TIME OF PAYMENT OF CLAIMS.** When the Company receives proof of claim, benefits payable under this Policy will be paid as follows.

1. Any Long Term Disability benefits will be paid monthly, during any period for which the Company is liable. If benefits are due for less than a month, they will be paid on a prorata basis. The daily rate will equal 1/30 of the monthly benefit.
2. Any balance which remains unpaid at the end of the period of liability will be paid immediately upon receipt of due written proof.

**TO WHOM PAYABLE.** All benefits are payable to the Insured Employee; except after his or her death benefits will be payable as follows.

1. Any Survivor Benefit will be payable in accord with that Policy provision.
2. Any other benefits will be payable to the Insured Employee's estate.

When a benefit becomes payable to the Insured Employee's estate, a minor or any other person who is not legally competent to give a valid receipt; then up to $2,000 may be paid to any relative of the Insured Employee that the Company finds entitled to payment. If payment is made in good faith to such a relative, the Company will not have to pay that benefit again.

**NOTICE OF CLAIM DECISION.** Within a reasonable time after receiving proof of loss, the Company will send the Insured Employee a written notice of their claim decision. If the Company denies any part of the claim, the written notice will:

1. explain the reason for the denial under the terms of this Policy; and
2. inform the Insured Employee of the right to a review of the Company's decision.

If the Insured Employee does not receive a written decision within 90 days after the Company receives his or her claim; then the Insured Employee has a right to an immediate review, as if the claim was denied.

GL3001-LTD-8 98

05/01/01

## CLAIMS PROCEDURES
### (continued)

REVIEW PROCEDURE.  Within 60 days after receiving a denial notice, the Insured Employee may request a claim review by sending the Company a written request, along with any written comments or other items to support the claim.  The Insured Employee may review certain non-privileged information relating to the request for review.

The Company will review the claim and send the Insured Employee a written notice of their decision within 60 days after receiving the request for review; or within 120 days, if special circumstances require an extension.  The notice will state the reasons for the Company's decision under the terms of this Policy.

RIGHT OF RECOVERY.  If benefits have been overpaid on any claim, full reimbursement to the Company is required within 60 days.  If reimbursement is not made, the Company has the right to:
1.   reduce future benefits until full reimbursement is made; and
2.   recover such overpayments from the Insured Employee or his or her estate.
Such reimbursement is required whether the overpayment is due to fraud, the Company's error in processing a claim, the Insured Employee's receipt of Other Income Benefits, or any other reason.

LEGAL ACTIONS.  No legal action to recover any benefits may be brought until sixty days after the required written proof of claim has been given.  No legal action may be brought more than three years after written proof of claim is required to be given.

GL3001-LTD-8 98

05/01/01

## ELIGIBILITY

**ELIGIBLE CLASSES.** The classes of Employees eligible for insurance are shown in the Schedule of Benefits. The Company has the right to review and terminate any or all classes eligible under this Policy, if any class ceases to be covered by this Policy.

**ELIGIBILITY DATE.** An Employee becomes eligible for coverage provided by this Policy on the later of:
1. the Policy's effective date; or
2. the date the Employee satisfies the Waiting Period.

Prior service in an Eligible Class will apply toward the Waiting Period, when:
1. a former Employee is rehired within one year after his or her employment ends; or
2. an Employee returns from a Family or Medical Leave within the leave period required by federal or state law (whichever is greater).

## EFFECTIVE DATES

**EFFECTIVE DATE.** Except as stated in the Delayed Effective Date provision, coverage for an Employee becomes effective at 12:01 a.m. on the latest of:
1. the first day of the Insurance Month coinciding with or next following the date the Employee becomes eligible for coverage;
2. the date the Employee makes written application for coverage; and signs:
   (a) a payroll deduction order, if the Employees pay any part of the Policy premiums; or
   (b) an order to pay premiums from the Employee's Flexible Benefits Plan account, if premiums are paid through such an account; or
3. the date the Company approves the Employee's evidence of insurability, if required.

Evidence of insurability satisfactory to the Company must be submitted (at the Employee's expense) if:
1. written application for coverage (or an increased amount of coverage) is made more than 31 days after the Employee becomes eligible for such coverage;
2. coverage is elected after the Employee has requested:
   (a) to terminate the insurance;
   (b) to stop payroll deductions for the insurance; or
   (c) to stop premium payments through a Flexible Benefits Plan account;
3. coverage is elected after the Employee has caused insurance to lapse by failing to pay the required premium when due; or
4. optional, supplemental, voluntary or Buy-Up Benefit coverage is elected in excess of any guaranteed issue amounts shown in the Schedule of Benefits.

**DELAYED EFFECTIVE DATE.** An Employee's Effective Date of any initial, increased or additional coverage will be delayed; if such Employee is not Actively-at-Work on the date that coverage would otherwise be effective. Coverage will take effect on the Employee's second consecutive day of Active Work.

EFFECTIVE DATE FOR CHAN⌐⌐ IN ELIGIBLE CLASS. An Insured Employee may become a member of a different Eligible Class. Except as stated in the Delayed Effective Date provision, coverage under the different Eligible Class will be effective:

1. immediately, if the different Eligible Class involves any reduction in coverage; or
2. the first day of the month after the Insured Employee has been Actively-at-Work for at least 15 days, as a member of a different Eligible Class; if the different Eligible Class involves enhancement of any coverage.

REINSTATEMENT AFTER FAMILY OR MEDICAL LEAVE. A new Waiting Period and evidence of insurability will be waived for an Employee, upon return from an approved Family or Medical Leave, provided:

1. the Employee returns within the leave period required by federal or state law (whichever is greater);
2. the Employee applies for insurance or is enrolled under this Policy within 31 days after resuming Active Work; and
3. the reinstated amount of insurance does not exceed the amount which terminated.

If the above conditions are met, the months of leave will count towards any unmet Pre-Existing Condition Exclusion period; and a new Pre-Existing Condition Exclusion will not apply to the reinstated amount of insurance. A new Pre-Existing Condition Exclusion will apply to any increased amount of insurance, however.

GL3001-LTD-9 94

05/01/01

### INDIVIDUAL TERMINATION

INDIVIDUAL TERMINATION OF COVERAGE.  An Insured Employee's coverage will terminate at 12:00 midnight on the earliest of:

1.  the date this Policy or the Employer's participation terminates; but without prejudice to any claim incurred prior to termination;
2.  the date the Insured Employee's Class is no longer eligible for insurance;
3.  the date such Insured Employee ceases to be a member of an Eligible Class;
4.  the end of the period for which the last required premium has been paid; or
5.  the date on which the Insured Employee's employment with the Employer terminates; unless coverage is continued as provided below.

CONTINUATION.    Ceasing Active Work is deemed termination of employment; but insurance may be continued as follows.

1.  **Ceasing Active Work**.  If the Insured Employee ceases Active Work, and does not become eligible for similar group disability income coverage within 31 days after employment ends; then coverage may be continued:
    (a)  for 31 days;
    (b)  provided the Company receives the required premium from the Employer.

2.  **Disability**.  If an Insured Employee is absent due to Total Disability, or is engaged in Partial Disability Employment; then Long Term Disability insurance may be continued during:
    (a)  the Elimination Period; provided the Company receives the required premium from the Employer; and
    (b)  the period for which Long Term Disability benefits are payable, without payment of premium.

3.  **Family or Medical Leave**.  If an Insured Employee goes on an approved Family or Medical Leave, and is not entitled to continue insurance due to Disability, as provided above; then Long Term Disability insurance may be continued, until the earliest of:
    (a)  the end of the leave period approved by the Employer;
    (b)  the end of the leave period required by federal or state law (whichever is greater);
    (c)  the date the Insured Employee notifies the Employer that he or she will not return; or
    (d)  the date the Insured Employee begins employment with another employer;
    provided the Company receives the required premium from the Employer.

4.  **Lay-off or Other Leave**.  When an Insured Employee goes on a temporary lay-off, or an approved leave of absence which is not subject to the federal Family and Medical Leave Act (or any similar state law); then Long Term Disability insurance may be continued:
    (a)  until the end of the calendar month following the month in which the lay-off or leave began;
    (b)  provided the Company receives the required premium from the Employer.

5.  **Plant Closing**.  When an Insured Employee ceases Active Work due to a plant closing or partial closing (as defined by Massachusetts law); then insurance may be continued:
    (a)  for 90 days after the closing; or
    (b)  until he or she becomes eligible for similar group disability income coverage (whichever occurs first);
    provided the Company receives the required premium from the Employer.

When an Insured Employee is entitled to continue coverage in accord with two provisions shown above, he or she may elect the longer continuation period (but not both).

The Employer must not act so as to discriminate unfairly among Employees in similar situations.  Insurance may not be continued when an Insured Employee ceases Active Work due to a labor dispute, strike, work slowdown or lockout.

INDIVIDUAL TERMINATION DURING DISABILITY.  Termination of an Insured Employee's coverage during a Disability will have no effect on benefits payable for that period of Disability.

GL3001-LTD-10 98 MA

05/01/01

## POLICY TERMINATION

**POLICY TERMINATION BY THE COMPANY.** Until the premium rate has been in effect for at least 12 months, or any later Rate Guarantee Date agreed upon by the Company; the Company may terminate this Policy on the due date of any premium if:

1. the number of Insured Employees totals less than 10;
2. part of the premium is paid by the Insured Employee and less than 75% of those eligible for coverage are insured;
3. all of the premium is paid by the Policyholder and less than 100% of those eligible for coverage are insured;
4. the Policyholder fails to promptly furnish any information which the Company may reasonably require;
5. the Policyholder, without good cause, fails to perform its duties pertaining to this Policy in good faith.
6. the Company's liability is changed as a result of any change in federal, state or local law which affects this Policy;
7. the Policyholder or any covered division, subsidiary or affiliated company relocates;
8. the Policyholder or any covered subsidiary or affiliated company dissolves or merges;
9. a division, subsidiary or affiliated company is added to or removed from this Policy;
10. any coverage for one or more classes of Insured Employees ceases to be provided under this Policy;
11. the number of Insured Employees changes by 25% or more from the number of Insured Employees on the date this Policy took effect, or the most recent Rate Guarantee Date expired, if later; or
12. the Employer ceases to be covered under the state Workers' Compensation program or any other program of like intent.

After the premium rate has been in effect for at least 12 months, or any later Rate Guarantee Date agreed upon by the Company; the Company may terminate this Policy on the due date of any premium. Such termination may be with respect to the Policy as a whole, to any coverage(s) provided under it, or to any class of Insured Employees covered under it.

The Company will give the Policyholder at least 31 days' advance written notice of its intent to terminate this Policy.

**POLICY TERMINATION BY THE POLICYHOLDER.** The Policyholder may terminate this Policy at any time by giving the Company written notice. This Policy will then terminate on:

1. the date the Company receives the notice; or
2. some later date on which the Policyholder and the Company have agreed.

However, termination will not become effective during any period for which premium has been paid to the Company. The Policyholder remains liable for the payment of premiums to the date of termination.

**AUTOMATIC POLICY TERMINATION.** If any premium is not paid before the end of the Grace Period; then this Policy will terminate at the end of the Grace Period, without any action on the Company's part. The Policyholder remains liable for the payment of premiums to the date of termination.

**POLICY TERMINATION DURING DISABILITY.** Termination of this Policy or an Employer's participation during a Disability shall have no effect on benefits payable to the Insured Employee for that period of Disability.

GL3001-LTD-10 98 MA

05/01/01

## PREMIUMS AND PREMIUM RATES

**PAYMENT OF PREMIUM.** No coverage provided by this Policy will be in effect until the first premium for such coverage is paid. For coverage to remain in effect, the Employer must pay each subsequent premium on or before its due date at the Company's Home Office. The premium must be paid in U.S. dollars.

**PREMIUM RATES.** The initial premium rates for this Policy are shown on the Face Page of this Policy. Premium rates are subject to change.

**PREMIUM RATE CHANGE.** The Company may change any premium rate:
1. when this Policy's terms are changed:
   (a) as agreed upon by the Policyholder and the Company; or
   (b) as a result of a change in federal, state or local law which affects this Policy;
2. when the Company's liability is changed as a result of a change in federal, state, or local law;
3. when the Policyholder or any covered division, subsidiary or affiliated company relocates;
4. when a division, subsidiary, or affiliated company is added to or removed from this Policy;
5. when the number of Insured Employees changes by 25% or more from the number of Insured Employees on the date this Policy took effect or the most recent Rate Guarantee Date expired, if later;
6. when the Employer ceases to be covered by the state Workers' Compensation program or any other program of like intent; or
7. on any premium due date on or after:
   (a) this Policy's first anniversary; or
   (b) any later Rate Guarantee Date agreed upon by the Company.

Unless the Company and the Group Policyholder agree otherwise, the Company will give at least 31 days' advance written notice of any increase in premium rates.

**MONTHLY PREMIUM AMOUNT.** The amount of monthly premium due on each due date will be the Total Covered Payroll multiplied by the premium rate. Changes will not be pro-rated daily. Instead, premium will be adjusted as follows.
1. When an Insured Employee's insurance (or increased amount of insurance) takes effect, premium will be charged from the monthly due date coinciding with or next following that change.
2. When all or part of an Insured Employee's insurance terminates, the applicable premium will cease on the monthly due date coinciding with or next following that termination.
3. When premiums are paid other than monthly, increases or decreases will result in an adjustment from the premium due date coinciding with or next following that change.

The above manner of charging premium is for accounting purposes only. It will not extend insurance coverage beyond a date it would have otherwise terminated.

Each premium payment will include any adjustments in past premiums, which are needed due to changes that have not yet been taken into account. If a premium adjustment involves a return of unearned premium, the amount of the return will be limited to the prior 12-month period.

**GRACE PERIOD.** A Grace Period of 31 days from the due date will be allowed for the payment of each premium after the first. This Policy will remain in effect during the Grace Period. The Policyholder will be liable to the Company for the payment of all premiums due for the period this Policy remains in effect, however.

**WAIVER OF PREMIUM.** Premium will be administered as follows during any period for which benefits are payable.
1. Long Term Disability premium payments are waived for an Insured Employee who is Disabled, during any period for which benefits are payable.
2. If coverage is to be continued following a period during which premiums were waived; then premium payments must be resumed, as they become due.

GL3001-LTD-11 98

05/01/01

## TOTAL DISABILITY MONTHLY BENEFIT

**BENEFIT.** The Company will pay a Total Disability Monthly Benefit to an Insured Employee, after the completion of the Elimination Period; if he or she:

1. is Totally Disabled;
2. is under the regular care of a Physician; and
3. at his or her own expense, submits proof of continued Total Disability and Physician's care to the Company upon request.

The Total Disability Monthly Benefit will cease on the earliest of:

1. the date the Insured Employee ceases to be Totally Disabled or dies;
2. the date the Maximum Benefit Period ends;
3. the date the Insured Employee is able, but chooses not to engage in Partial Disability Employment:
   (a)  in his or her regular occupation, during the Own Occupation Period; or
   (b)  in any gainful occupation, after the Own Occupation Period;
4. the date the Insured Employee fails to take a required medical exam, without good cause; or
5. the 60th day after the Company mails a request for additional proof, if not given.

**AMOUNT.** The amount of the Total Disability Monthly Benefit equals:

1. the Insured Employee's Basic Monthly Earnings multiplied by the Benefit Percentage (limited to the Maximum Monthly Benefit); minus
2. Other Income Benefits.

The amount of the Total Disability Monthly Benefit will not be less than the Minimum Monthly Benefit. The Benefit Percentage, Maximum Monthly Benefit, Minimum Monthly Benefit and Maximum Benefit Period are shown in the Schedule of Benefits.

## DEFINITION

**"Total Disability" or "Totally Disabled"** will be defined as follows.

1. During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the main duties of his or her regular occupation.
2. After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform each of the main duties of any gainful occupation which his or her training, education or experience will reasonably allow.

The loss of a professional license, an occupational license or certification, or a driver's license for any reason does **not**, by itself, constitute Total Disability.

## PAR...AL DISABILITY MONTHLY BEN...IT

**BENEFIT.** The Company will pay a Partial Disability Monthly Benefit to an Insured Employee, after completion of the Elimination Period; if he or she:
1. is Disabled;
2. is engaged in Partial Disability Employment;
3. is earning at least 20% of Predisability Income when Partial Disability Employment begins;
4. is under the regular care of a Physician; and
5. at his or her own expense, submits proof of continued Partial Disability, Physician's care and reduced earnings to the Company upon request.

The Insured Employee does not have to be Totally Disabled prior to receiving Partial Disability Monthly Benefits. The Elimination Period may be satisfied by days of Total Disability, Partial Disability or any combination thereof.

The Partial Disability Monthly Benefit will cease on the earliest of:
1. the date the Insured Employee ceases to be Partially Disabled or dies;
2. the date the Maximum Benefit Period ends;
3. the date the Insured Employee earns more than:
   (a) 99% of Predisability Income, until Partial Disability Monthly Benefits have been paid for 24 months for the same period of Disability; or
   (b) 85% of Predisability Income, after Partial Disability Monthly Benefits have been paid for 24 months for the same period of Disability;*
4. the date the Insured Employee is able, but chooses not to work full-time:
   (a) in his or her regular occupation, during the Own Occupation Period; or
   (b) in any gainful occupation, after the Own Occupation Period;
5. the date the Insured Employee fails to take a required medical exam, without good cause; or
6. the 60th day after the Company mails a request for additional proof, if not given.

*If the Insured Employee's earnings from Partial Disability Employment fluctuate, the Company has the option to average the most recent three months' earnings and continue the claim; provided that average does not exceed the percentage of Predisability Income allowed above. A Monthly Benefit will not be payable for any month during which earnings exceeded that percentage, however.

## DEFINITIONS

**"Full-Time"** means the average number of hours the Insured Employee was regularly scheduled to work, at his or her regular occupation, during the month just prior to:
1. the date the Elimination Period begins; or
2. the date an approved leave of absence begins, if the Elimination Period begins while the Insured Employee is continuing coverage during a leave of absence.

**"Partially Disabled"** or **"Partial Disability"** will be defined as follows.
1. During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee:
   (a) is unable to perform one or more of the main duties of his or her regular occupation, or is unable to perform such duties full-time; and
   (b) is engaged in Partial Disability Employment.
2. After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee:
   (a) is unable to perform one or more of the main duties of any gainful occupation which his or her training, education or experience will reasonably allow; or is unable to perform such duties full-time; and
   (b) is engaged in Partial Disability Employment.

## PAR I IAL DISABILITY MONTHLY BENr.r'IT
### (Continued)

BENEFIT AMOUNT.    The Partial Disability Monthly Benefit will replace the Insured Employee's Lost Income; provided it does not exceed the Total Disability Monthly Benefit, which would otherwise be payable during Total Disability without the Partial Disability Employment.

Thus, the amount of the Partial Disability Monthly Benefit will equal the lesser of A or B below.

A.    LOST INCOME:    The Insured Employee's Predisability Income, minus all Other Income Benefits (including earnings from Partial Disability Employment).

B.    TOTAL DISABILITY MONTHLY BENEFIT otherwise payable:
1.    The Insured Employee's Predisability Income multiplied by the Benefit Percentage (limited to the Maximum Monthly Benefit); minus
2.    Other Income Benefits, except for earnings from Partial Disability Employment.

The Partial Disability Monthly Benefit will never be less than the Minimum Monthly Benefit.    The Benefit Percentage, Maximum Monthly Benefit, Minimum Monthly Benefit, and Maximum Benefit Period are shown in the Schedule of Benefits.

Progressive Calculation

GL3001-LTD-13.4

05/01/01

## OTHER INCOME BENEFITS

OTHER INCOME BENEFITS means those benefits shown below:

1. Any temporary or permanent benefits or awards for which the Insured Employee is eligible under:
   (a) Worker's or Workmen's Compensation Law;
   (b) occupational disease law; or
   (c) any other act or law of like intent.
2. Any disability income benefits for which the Insured Employee is eligible under any compulsory benefit act or law.
3. Any disability income benefits for which the Insured Employee is eligible under:
   (a) any other group plan, sick leave or salary continuance plan of the Employer; or
   (b) any governmental retirement system as a result of the Insured Employee's job with the Employer.
4. Any Disability Benefits or Retirement Benefits the Insured Employee receives under a Retirement Plan.
5. Benefits under the United States Social Security Act, the Canada Pension Plan, the Quebec Pension Plan or any similar plan or act as follows:
   (a) disability or unreduced retirement benefits for which the Insured Employee and any spouse or child is eligible, because of the Insured Employee's Disability or eligibility for unreduced retirement benefits; or
   (b) reduced retirement benefits received by the Insured Employee and any spouse or child because of the Insured Employee's receipt of reduced retirement benefits.
6. Earnings the Insured Employee earns or receives from any form of employment.

These Other Income Benefits, except Retirement Benefits, are benefits resulting from the same Disability for which a Monthly Benefit is payable under this Policy.

An Insured Employee who may be entitled to some Other Income Benefit is required to actively pursue it; if he or she does not, Policy benefits may be denied or suspended.

COST-OF-LIVING FREEZE. After the first deduction for each of the Other Income Benefits, the Monthly Benefit will not be further reduced due to any cost-of-living increases payable under these Other Income Benefits.

LUMP SUM PAYMENTS. Other Income Benefits which are paid in a lump sum will be prorated on a monthly basis over the time period for which the sum is given. If no time period is stated, the sum will be prorated on a monthly basis over the time the Company expects the Insured Employee to live.

ESTIMATED PAYMENTS. When the Insured Employee may qualify for certain Other Income Benefits, the Company may estimate the amount of such benefits. The Company may reduce the Insured Employee's Monthly Benefits by such estimated amounts, which:

1. have not yet been awarded or denied; or
2. have been denied, if the denial is being appealed.

If an Insured Employee's Monthly Benefits have been reduced by an estimated amount; then such payments will be adjusted when the Company receives proof:

1. of the amount actually awarded; or
2. that benefits have been denied, and that any appeal the Company deems necessary has been completed. (In that event, a lump sum will be refunded to the Insured Employee.)

## RECURRENT DISABILITY

"Recurrent Disability" means a Disability due to an Injury or Sickness which is the same as, or related to, the cause of a prior Disability for which Monthly Benefits were payable. A Recurrent Disability will be treated as follows.

1.  A Recurrent Disability will be treated as a new period of Disability, and a new Elimination Period must be completed before further Monthly Benefits are payable; if the Insured Employee returns to his or her regular occupation on a full-time basis for six months or more.

2.  A Recurrent Disability will be treated as part of the prior Disability, if an Insured Employee returns to his or her regular occupation on a full-time basis for less than six months.

To qualify for a Monthly Benefit, the Insured Employee must earn less than the percentage of Predisability Income specified in the Partial Disability Monthly Benefit section. Monthly Benefit payments will be subject to all other terms of this Policy for the prior Disability.

If an Insured Employee becomes eligible for coverage under any other group Long Term Disability policy, this Recurrent Disability provision will cease to apply to that Insured Employee.

## EXCLUSIONS

GENERAL EXCLUSIONS.  This Policy will not cover any period of Total or Partial Disability:
1.　　due to war, declared or undeclared, or any act of war;
2.　　due to intentionally self-inflicted injuries;
3.　　due to active participation in a riot;
4.　　due to the Insured Employee's committing of or the attempting to commit a felony or any type of assault or battery;
5.　　during which the Insured Employee is incarcerated for the commission of a felony; or
6.　　during which the Insured Employee is not under the regular care of a Physician.

PRE-EXISTING CONDITION EXCLUSION.  This Policy will not cover any Total or Partial Disability:
1.　　which is caused or contributed to by, or results from a Pre-Existing Condition; and
2.　　which begins in the first 12 months after the Insured Employee's Effective Date.

"Pre-Existing Condition" means a Sickness or Injury for which the Insured Employee received treatment within 3 months prior to the Insured Employee's Effective Date.

"Treatment" means consultation, care or services provided by a Physician.  It includes diagnostic measures and the prescription, refill of prescription, or taking of any prescribed drugs or medicines.

## SPECIFIED INJURIES OR SICKNESSES LIMITATION

**LIMITATION.** If an Insured Employee is Disabled primarily due to one or more of the Specified Injuries or Sicknesses defined below; then Partial or Total Disability Monthly Benefits:

1.    will be payable subject to the terms of this Policy; but
2.    will be limited to 24 months for any one period of Disability; unless the Insured Employee is confined to a Hospital.

"Specified Injuries or Sicknesses" include any Mental Sickness, or Substance Abuse, as defined below.

## CONDITIONS

1.    If the Insured Employee is confined in a Hospital at the end of the 24th month for which Policy benefits are paid for the Specified Injury or Sickness; then benefits will be payable until he or she is discharged from that facility.
2.    In no event will the Monthly Benefit be paid beyond the Maximum Benefit Period shown in the Schedule of Insurance, however.

## DEFINITIONS

**"Hospital,"** as used in this provision, means:

1.    a general hospital which:
    (a)    is licensed, approved or certified by the state where it is located;
    (b)    is recognized by the Joint Commission on the Accreditation of Hospitals; or
    (c)    is operated to treat resident inpatients; has a registered nurse always on duty;
        and has a lab, x-ray facility and place where major surgery is performed; and
2.    a skilled nursing care facility or unit, which provides convalescent or nursing care; and which is recognized as a skilled nursing care facility under Medicare.

The term Hospital also includes:

1.    a Mental Hospital when treatment is for a Mental Sickness; and
2.    a Treatment Center when treatment is for Substance Abuse.

**"Mental Hospital"** means a health care facility (or its psychiatric unit) which:

1.    is licensed, certified or approved as a mental hospital by the state where it is located;
2.    is equipped to treat resident inpatients' mental diseases or disorders; and
3.    has a resident psychiatrist on duty or on call at all times.

**"Mental Sickness"** means any emotional, behavioral, psychological, personality, adjustment, mood or stress-related abnormality, disorder, disturbance, dysfunction or syndrome; regardless of its cause. It includes, but is not limited to:

1.    schizophrenia or schizoaffective disorder;
2.    bipolar affective disorder, manic depression, or other psychosis; and
3.    obsessive-compulsive, depressive, panic or anxiety disorders.

These conditions are usually treated by a psychiatrist, a clinical psychologist or other qualified mental health care provider.    Treatment usually involves psychotherapy, psychotropic drugs or similar methods of treatment.

Mental Sickness does not include irreversible dementia resulting from:

1.    stroke, trauma, viral infection, Alzheimer's disease; or
2.    other conditions which are not usually treated by a mental health care provider using psychotherapy, psychotropic drugs, or similar methods of treatment.

**"Substance Abuse"** means alcoholism, drug abuse, or chemical dependency of any type.

**"Treatment Center"** means a health care facility (or its medical or psychiatric unit) which:

1.    is licensed, certified or approved by the state where it is located;
2.    has a program for inpatient treatment of substance abuse; and
3.    provides such treatment based upon a written plan approved and supervised by a Physician.

GL3001-LTD-17 98

Specified Limit.
05/01/01

# VOLUNTARY VOCATIONAL REHABILITATION BENEFIT PROVISION

**BENEFIT.** If an Insured Employee is Disabled and is receiving Policy benefits; then he or she may be eligible for a Vocational Rehabilitation Benefit. This Benefit consists of services which may include:
1. vocational evaluation, counseling, training or job placement;
2. job modification or special equipment; and
3. other services which the Company deems reasonably necessary to help the Insured Employee return to work.

The Company will determine the Insured Employee's eligibility and the amount of any Benefit payable.

**ELIGIBILITY.** An Insured Employee may be eligible for this Benefit, if the Company finds that he or she:
1. has a Disability that prevents the performance of his or her regular occupation; and, after the Own Occupation Period, also lacks the skills, training or experience needed to perform any other gainful occupation;
2. has the physical and mental abilities needed to complete a Program; and
3. is reasonably expected to return to work after completing the Program; in view of his or her degree of motivation and the labor force demand for workers in the proposed occupation.

The Company must also find that the cost of the proposed services is less than its expected claim liability.

**AMOUNT.** The amount of any Vocational Rehabilitation Benefit will not exceed the Company's expected claims liability. This benefit will not be payable for services covered under the Insured Employee's health care plan or any other vocational rehabilitation program. Payment may be made to the provider of the services, at the Company's option.

**CONDITIONS.** Either the Company, the Insured Employee, or his or her Physician may first propose vocational rehabilitation. When a Program is approved by the Company, this Policy's definition of "Disability" will be waived during the rehabilitation period; but it will be reapplied after the Program ends. The Company will determine the amount and duration of any Long Term Disability benefits payable after the Program ends.

**LIMITATION.** This Policy will not cover any period of Disability for an Insured Employee who has received a Vocational Rehabilitation Benefit and has failed to complete the Program, without Good Cause.

## DEFINITIONS

**"Good Cause"**, as used in this provision, means the Insured Employee's:
1. documented physical or mental impairments, which render the Insured Employee unable to take part in or complete a Program;
2. involvement in a medical program, which prevents or interferes with the Insured Employee's taking part in or completing a Program; or
3. participating in good faith in some other vocational rehabilitation program, which:
   (a) conflicts with taking part in or completing a Program developed by the Company; and
   (b) is reasonably expected to return the Insured Employee to work.

**"Program"** means a written vocational rehabilitation program:
1. which the Company develops with input from the Insured Employee; his or her Physician; and any current or prospective employer, when appropriate; and
2. which describes the Program's goals; each party's responsibilities; and the times, dates and costs of the rehabilitation services.

## REASONABLE ACCOMMODATION BENEFIT

If an Insured Employee of the Employer is Disabled, and is receiving Policy benefits; then the Employer may be eligible for a Reasonable Accommodation Benefit. This Benefit reimburses the Employer for 50% of the expense incurred for reasonable accommodation services for the Insured Employee; but will not exceed:

1.  a maximum benefit of $5,000 for any one Insured Employee; or
2.  the Company's expected liability for the Insured Employee's Long Term Disability claim (whichever is less).

Such services may include:

1.  providing the Insured Employee a more accessible parking space or entrance;
2.  removing barriers or hazards to the Insured Employee from the worksite;
3.  special seating, furniture or equipment for the Insured Employee's work station;
4.  providing special training materials or translation services during the Insured Employee's training; and
5.  other services the Company deems reasonably necessary to help the Insured Employee return to work with the Employer.

ELIGIBILITY FOR BENEFIT.  The Company will determine the Employer's eligibility to receive the Benefit. To qualify for the Benefit, the Employer must have an Insured Employee:

(a)  whose Disability prevents the performance of his or her regular occupation at the Employer's worksite;
(b)  who has the physical and mental abilities needed to perform his or her own or another occupation at the Employer's worksite; but only with the help of the proposed accommodation; and
(c)  who is reasonably expected to return to work with the help of the proposed accommodation.

The Company must also find that the requested Reasonable Accommodation Benefit is less than the expected liability for the Insured Employee's Long Term Disability claim.

WRITTEN PROPOSAL.  The reasonable accommodation services must be provided in accord with a written proposal, which is developed with input from:

1.  the Employer;
2.  the Insured Employee; and
3.  his or her Physician, when appropriate.

The proposal must state the purpose of the proposed accommodation; and the times, dates and costs of the services.

CONDITIONS.  Either the Company, the Employer, the Insured Employee, or his or her Physician may first propose an accommodation.

The proposal must be approved by the Company in writing.

The Company will then reimburse the Employer, upon receipt of proof that the Employer:

1.  has provided the services for the Insured Employee; and
2.  has paid the provider for the services.

## PRIOR INSURANCE CREDIT UPON TRANSFER OF INSURANCE CARRIERS

To prevent loss of coverage for an Employee because of a transfer of insurance carriers, this Policy will provide Prior Insurance Credit for employees insured under the prior carrier's policy on its termination date as follows.

FAILURE TO BE ACTIVELY-AT-WORK DUE TO INJURY OR SICKNESS.    Subject to premium payments, this Policy will provide coverage to an Employee:
1.   who was insured by the prior carrier's policy at the time of transfer; and
2.   who was not Actively-At-Work due to Injury or Sickness on this Policy's Effective Date.

The coverage will be that provided by the prior carrier's policy, had it remained in force.  The Company will pay:
1.   the benefit that the prior carrier would have paid; minus
2.   any amount for which the prior carrier is liable.

DISABILITY DUE TO A PRE-EXISTING CONDITION.  Benefits may be payable for a Total Disability due to a Pre-Existing Condition for an Employee who:
1.   was insured by the prior carrier's policy at the time of transfer; and
2.   was Actively-At-Work and insured under this Policy on this Policy's Effective Date.

The benefits will be determined as follows:
1.   The Company will apply this Policy's Pre-Existing Condition Exclusion.  If the Insured Employee qualifies for benefits, such Insured Employee will be paid according to this Policy's benefit schedule.
2.   If the Insured Employee cannot satisfy this Policy's Pre-Existing Condition Exclusion, but can satisfy the prior carrier's pre-existing condition exclusion giving consideration towards continuous time insured under both policies; then he or she will be paid in accord with the benefit schedule and all other terms, conditions and limitations of:
     (a)   this Policy without applying the Pre-Existing Condition Exclusion; or
     (b)   the prior carrier's policy;
     whichever is less.
3.   If the Insured Employee cannot satisfy the Pre-Existing Condition Exclusion of this Policy or that of the prior carrier, no benefit will be paid.

Prior Insurance Credit

## FAMILY INCOME BENEFIT

The Company will pay a lump sum benefit to the Eligible Survivor, when proof is received that an Insured Employee died:
1.   after Disability had continued for 180 or more consecutive days; and
2.   while receiving a Monthly Benefit.

The benefit will be equal to three times the Insured Employee's Last Monthly Benefit.

"Last Monthly Benefit" means the gross Monthly Benefit payable to the Insured Employee immediately prior to death.  Any reductions for Other Income Benefits, or for earnings the Insured Employee received for Partial Disability Employment, will not apply.

"Eligible Survivor" means the Insured Employee's:
1.   surviving spouse; or, if none
2.   surviving children who are under age 25 on the Insured Employee's date of death.

If payment becomes due to the Insured Employee's children; then payment will be made to:
1.   the surviving children, in equal shares; or
2.   a person named by the Company to receive payments on the children's behalf.

This payment will be valid and effective against all claims by others representing, or claiming to represent, the children.

Three Month Survivor Benefit

GL3001-LTD-19 94

05/01/01

# AMENDMENT NO. 1

TO BE ATTACHED TO AND MADE A PART OF POLICY NO.:   000010030695

ISSUED TO:  Town of Falmouth

It is agreed that the above policy be amended effective:  May 1, 2001

The Grace Period Section shown on form GL3001-LTD-11 is amended to read as follows:

A Grace Period of 45 days from the due date will be allowed for the payment of each premium after the first. The Policy will remain in effect during the Grace Period.  The Policyholder will be liable to the Company for the payment of all premiums due for the period the Policy remains in effect, however.

This amendment applies to disabilities commencing on or after such date.

The provisions and conditions set forth on any page hereof are a part of this amendment as fully as if recited over the signature hereto affixed. Nothing contained in this amendment shall change any of the terms and conditions of this Policy; except as stated above.

**Jefferson Pilot Financial Insurance Company**

Officer of the Company

GL1100A AMEND.

## Long Term Disability Claim Employee's Statement

**To Be Completed By The Employee**

**A. Information about you**

| Last Name | First | Middle Initial |
|---|---|---|
| WIESNER | SANDRA | C |

Address
3 RAINBOW CIRCLE

| City | State/Province | Zip |
|---|---|---|
| BUZZARDS BAY | MA | 02532 |

Telephone
(508) 759-8981  unlisted

Social Security Number
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

| Date of Birth (Month, Day, Year) | Height | Weight | | | |
|---|---|---|---|---|---|
| 1-1-56 | 5'4" | 190 | ☒ Rt Handed  ☐ Lt. Handed | ☐ Male  ☒ Female | ☒ Single  ☐ Married  ☐ Widowed  ☐ Divorced |

Your Employer (include division if applicable)
FALMOUTH PUBLIC SCHOOLS / EAST FALMOUTH ELEM

Occupation
TEACHER - KINDERGARTEN

**B. Information about your family (required to determine your eligibility for Social Security benefits)**

Spouse's Name (Last, First)
N/A

| Spouse's Social Security Number | Date of Birth (Month, Day, Year) | Is your spouse employed? |
|---|---|---|
| N/A | N/A | ☐ Yes  ☐ No  N/A |

| Children under age 25: Name (Last, First) | Date of Birth (Month, Day, Year) |
|---|---|
| N/A | |

**C. Information about the condition causing your disability**

**1. For pregnancy or illness, answer the following questions:**

What were your first symptoms? CHRONIC SINUS INFECTION; CHRONIC FATIGUE, LOW STAMINA; WEAKNESS; DIZZINESS; SLEEP DISTURBANCE; CHRONIC SORE THROAT + POST NASEL DRIP; SEVERE (on

| When did you first notice them? | Date you were first treated by a physician (Month, Day, Year) |
|---|---|
| SINUS INFECTION + FATIGUE - OCTOBER 2000 | 10/6/2000 |

**2. For an injury, answer the following questions:**

Where and how did the injury occur?
N/A

| Date the injury occurred (Month, Day, Year) | Date you were first treated by a physician (Month, Day, Year) |
|---|---|
| N/A | N/A |

**3. For illness or injury, answer the following questions:**

Why are you unable to work? CHRONIC FATIGUE + LOW STAMINA; STIFF, PAINFUL JOINTS; BURNING PAIN + NUMBNESS OF LEFT THIGH; CHRONIC HEADACHES WITH TMJ PAIN; (over

Before you stopped working, did your condition require you to change your job or the way you did your job?
☒ Yes  ☐ No   If yes, explain ARRIVING LATER TO WORK + LEAVING EARLIER; over

Is your condition related to your occupation?
☒ Yes  ☐ No   If yes, explain EXPOSURE TO CHILDHOOD ILLNESSES WHICH CONTRIBUTES TO (ove

Have you filed, or do you intend to file a Workers' Compensation claim?
☐ Yes  ☒ No

**D. Information about the disability**

| Last day you worked before the disability (Month, Day, Year) 1/30/01 | Did you work a full day? ☒ Yes  ☐ No   If no, explain | Date you were first unable to work? (Month, Day, Year) 1/31/01 |
|---|---|---|

Have you returned to work?
☐ Yes   Part time (date) _____  Full time (date) _____
☒ No

If you have not returned to work, do you expect to?
☐ Yes   Part time (date) _____  Full time (date) _____
☐ No   I HAVE NO IDEA

Are you currently self-employed or working for another employer?
☐ Yes  ☒ No   If so, give details.

(Continued on next page)

1) MUSCLE SPASMS + TWITCHES; NUMBNESS + TINGLING OF HANDS + FEET; FLARE-UP OF IRRITABLE BOWEL SYNDROME; POOR CONCENTRATION, SHORT TERM MEMORY + PROCESSING INFORMATION; CHRONIC HEADACHES; INCREASED DEPRESSION; ELEVATED MONO TITER

3) COGNITIVE ISSUES, i.e. LOW CONCENTRATION + SHORT TERM MEMORY, DIFFICULTY RETAINING NEW INFO., DIFFICULTY WITH WORD RETRIEVAL, DIZZINESS + BALANCE PROBLEMS, ALLERGY SYMPTOMS ALTHOUGH NEGATIVE ALLERGY TESTS Xz DX WITH VASOMOTOR RHINITIS, MUSCLE PAIN, TWITCHES + SPASMS, SLEEP IRREGU-LARITIES

- DIFFICULTY PARTICIPATING IN STAFF MEETINGS, SPED MEETINGS and GRAD COURSE; DIFFICULTY CONCENTRATING ON REPORT CARDS; LOW TOLERANCE FOR WORK RELATED STRESS; DIFFICULTY CONCENTRATING ON + IMPLEMENTING NEW CURRICULUM; DIFFICULTY KEEPING CLASSROOM ENVIRONMENT CLEAN + ORGANIZED; DIFFICULTY RETAINING INFORMATION PERTAINING TO STUDENTS' SPECIAL NEEDS + DEVELOPEMENT

- TO CHRONIC SECONDARY INFECTIONS; WORK RELATED STRESS + STATE REQUIREMENT: FOR ADVANCED EDUCATION CONTRIBUTE TO FATIGUE, ECT.

**E. Information about physicians and hospitals**

First medical attention for the current disability was given by (complete below):

| Doctor's Name | Telephone: (508) | Specialty |
|---|---|---|
| DR. RICHTER & JOAN PETERS-GILMARTIN, PAC | Fax ( ) 477-4282 | GENERAL |
| Address (Street, City, State, Zip) | | Dates Seen PATIENT FOR SEVER |
| MASHPEE FAMILY MEDICINE, 5 INDUSTRIAL DR. SUITE 100, P.O. BOX 1500 MASHPEE, MA 02649 | | 10/6/00 To PRESENT YEARS |

List all other physicians and hospitals you have seen for this condition:

| Doctor's Name | Telephone: (508) | Specialty |
|---|---|---|
| DR. PHILIP MOLLOY | ) 746-5351 | RHEUMATOLOGY |
| Address (Street, City, State, Zip) | | Dates Seen |
| MEDICAL CENTER AT THE PARK, 45 RESNIK RD, PLYMOUTH, MA 02360 | | 9/26/01 To PRESENT |

| Doctor's Name | Telephone: (508) | Specialty |
|---|---|---|
| DR. WALTER MCLEAN | Fax ( ) 548-4259 | ALLERGIST |
| Address (Street, City, State, Zip) | | Dates Seen |
| 314-2 GIFFORD ST, FALMOUTH, MA 02540 | | 8/5/97 To + 5/30/01 |

| Doctor's Name | Telephone: (617) | Specialty |
|---|---|---|
| DR. DONNA FELSENSTEIN | Fax ( ) 726-3906 | INFECTIOUS DISEASE |
| Address (Street, City, State, Zip) | | Dates Seen AND |
| MASS GENERAL HOSP., 55 FRUIT ST, BOSTON, MA 02114-2696 | | 4/30/01 To 6/21/01 |

| Hospital | | |
|---|---|---|
| DR. BRUCE SIGSBEE    508-775-0202    NEUROLOGY | | |
| Address (Street, City, State, Zip) | | Dates of Confinement |
| 8 EAST MAIN ST., HYANNIS, MA | | To 7/17/01 |

Have you ever had the same or a similar condition in the past?

☑ Yes ☐ No   If yes, complete the following concerning your past treatment:

| Doctor's Name   ORIGINAL DIAGNOSIS OF | Telephone: (508) | Specialty |
|---|---|---|
| DR. PAUL LEE    EASTIEN-BARR VIRUS | Fax ( ) 540-6790 | GENERAL |
| Address (Street, City, State, Zip) | | Dates Seen |
| 309 TEATICKET HWY, FALMOUTH, MA | | 1992 To 1996 |

over

| Hospital | | |
|---|---|---|
| DR. JEAN TALBERT    508-457-0088 | | OB/GYN |
| Address (Street, City, State, Zip) | | Dates of Confinement |
| 182 PALMER AVE., FALMOUTH, MA 02540 | | 1996 To PRESENT |

**F. Information about other disability income**

(Check the other income benefits you are receiving or are eligible to receive as a result of your disability and complete the information requested.)

| Source of Income | Amount | / (wk., mon.) | Date claim was filed | Date payments began | Date payments ended |
|---|---|---|---|---|---|
| Social Security/Retirement | $ ___ | / ___ | ___ | ___ | ___ |
| Social Security/Disability | $ ___ | / ___ | ___ | ___ | ___ |
| Canadian Pension Plan | $ ___ | / ___ | ___ | ___ | ___ |
| Workers' Compensation | $ ___ | / ___ | ___ | ___ | ___ |
| State Disability | $ ___ | / ___ | ___ | ___ | ___ |
| Pension/Retirement | $ ___ | / ___ | ___ | ___ | ___ |
| Pension/Disability | $ ___ | / ___ | ___ | ___ | ___ |
| Short Term Disability | $ ___ | / ___ | ___ | ___ | ___ |
| Unemployment | $ ___ | / ___ | ___ | ___ | ___ |
| No-Fault Insurance | $ ___ | / ___ | ___ | ___ | ___ |
| Railroad Retirement | $ ___ | / ___ | ___ | ___ | ___ |
| Other (include individual or group benefits): | $ ___ | / ___ | ___ | ___ | ___ |

**G. Information about income tax withholding**

If your request for benefits is approved, should Jefferson Pilot Financial Insurance Company withhold income taxes from your benefit checks?
☐ Yes ☐ No   If yes, how much should be withheld from each check. Federal taxes (minimum is $88.00 per month) $ ___ .00

**H. Signature (Required for all claims)**

Under what other Jefferson Pilot Financial Insurance policies are you currently covered?

The above statements are true and complete to the best of my knowledge and belief.

X _Sandra Wiesner_ _____     12/18/01

Signature of Employee     Date

GLC-01252

## Long Term Disability Claim Physician's Statement

This form should be completed by the physician who was treating the claimant when he or she last worked.
**To Be Completed By The Attending Physician**

**A. General Information**

This claim is for (Patient's Name) SANDRA WIESNER

| Patient's Social Security Number | Height 5-5 | Weight 195 | Blood Pressure 130/90 | Date of Birth (Month, Day, Year) 56 |
|---|---|---|---|---|

Primary Diagnosis including ICD 9 or DSM code Fibromyalgia Syndrome. Allergies. Depress.

**B. Complete this section for normal pregnancy, then go to section E.**

| What was the date of the last menstrual period? N|A | What is the expected date of delivery? |
|---|---|

| What is the expected length of postpartum recovery? | What was the first date of treatment? | What was the last date of treatment? |
|---|---|---|

**C. Complete this section for all conditions except normal pregnancy.**

Symptoms

Objective Findings: chronic fatigue, arthralgias/myalgias, cognitive difficulties, lowered immune status

Are there secondary conditions contributing to the disability?
☑ Yes ☐ No   If yes, what are they? (Please include ICD 9 or DSM code) depression. allergies/sinusitis - recurre

If this is a cardiac condition, what is the functional capacity? (American Heart Association)
☐ Class 1 - No limitation   ☐ Class 2 - Slight limitation   ☐ Class 3 - Marked limitation   ☐ Class 4 - Complete limitation

| When did symptoms first appear? February 1992 | Date of the patient's first visit (Month, Day, Year) 10/26/96 | Date you believe the patient was first unable to work (Month, Day, Year) 5/15/01 |
|---|---|---|

| Date of the patient's last visit (Month, Day, Year) 12-17-01 | | How often do you see the patient? as needed or Q 3 M |
|---|---|---|

Is the patient's condition work related?
☐ Yes ☑ No   If yes, explain:

Has the patient undergone surgery?
☐ Yes ☑ No   If yes, give date, procedure and result.

If no, do you expect surgery to be performed in the future?
☐ Yes ☑ No   If yes, give date and type of surgery.

What medication is the patient currently taking? Elavil 25 mg QD  Zoloft 100 mg QD, Zantac 150mg BID, Premarin 0.625 mg

Please indicate other types and frequencies of treatment: exercise/psychotherapy   Flolin nasal spray BID.

Has the patient been referred to a medical rehabilitation or therapy program?
☑ Yes ☐ No   If yes, give details. Chronic Pain Clinic, RHCI Sand

Have you referred the patient for other types of consultations?
☑ Yes ☐ No   If yes, give details. Rheumatology - Philip Molloy, M  PI
Behavioral Medicine - Beth Wechsler
Infectious Dx - Diane Felsenstein, B.

Has the patient been hospital confined?
☐ Yes ☐ No   If yes, complete the following: N/A

Name of Hospital

| Address | Dates of Confinement through |
|---|---|

(Continued on next page)

GLC-01252

**D. Information about the patient's inability to work**

Briefly describe restrictions and limitations.

Restrictions (What the patient SHOULD NOT do)

Limitations (What the patient CANNOT do) *continuous / chronic activity. Exposure / ill people!.*

What is your prognosis for recovery?   *POOR*

Has patient achieved maximum medical improvement?
☐ Yes  ☐ No   If no, complete the following:   *variable course*
How soon do you expect fundamental changes in the patient's medical condition?   *w/ short term remissie*
☐ 1 - 2 months              ☐ 5 -6 months
☐ 3 - 4 months              ☐ more than 6 months   *Waxing / waning severit*
Give details concerning expected improvement or deterioration.   *of symptom*

In an eight hour workday, claimant can: (Circle full hourly capacity for each activity)

| Activity | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sit | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| Stand | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| Walk | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |

| Are there restrictions in: | Yes | No | Comments |
|---|---|---|---|
| Lifting/Carrying | ☐ | ☐ | |
| Use of hands in repetitive actions | ☐ | ☐ | |
| Use of feet in repetitive movements | ☐ | ☐ | |
| Bending | ☐ | ☐ | |
| Squatting | ☐ | ☐ | |
| Crawling | ☐ | ☐ | |
| Climbing | ☐ | ☐ | |
| Reaching above shoulder level | ☐ | ☐ | |
| Other (please specify) | ☐ | ☐ | |

When do you expect claimant to return to prior level of functioning?   *undetermined*

Would you recommend vocational rehabilitation for this patient?
☐ Yes  ☒ No

**E. Required Attachments and Signature**

After you have fully completed this form, attach copies of the following materials:
  − Office notes for the period of treatment for the last two years
  − Test results showing objective findings
  − Hospital discharge summaries
  − Consulting physician reports

| Your Name | | Degree |
|---|---|---|
| JOAN PETERS-GILMARTIN, MHP, PA-C | | |
| **Specialty** Mashpee Family Medicine Mashpee Health Center-Rte. 28 | | Telephone: ( 508 ) 539 -6290 Fax: (508 ) 539 - 6265 |
| **Address** 5 Industrial Drive Suite 100 Mashpee, MA 02649 | | |

X _Joan A Peters - Gilmartin PA-C_   Date _12-17-0 1_

Signature of Attending Physician (no stamp)

JOAN PETERS-GILMARTIN, MHP, PA-C
Mashpee Family Medicine
Mashpee Health Center-Rte. 28
5 Industrial Drive Suite 100
Mashpee, MA 02649

GLC-01252

Page 12 of 12
8/00



ATTORNEYS
Ronald S. Beitman
Richard Latimer

OF COUNSEL
Steven Babitsky

*KISTIN, BABITSKY,*
*LATIMER & BEITMAN*

*Attorneys at Law*

FALMOUTH OFFICE
13 Falmouth Heights Road
P.O. Box 590
Falmouth, MA 02541-0590
Telephone (508) 540-1606
Fax (508) 540-5870

January 27, 2003

Risk Services—Employee Care Center
Jefferson Pilot Financial Insurance Company
P.O. Box 2337
Omaha, NE  68114

Re.    Sandra Wiesner
        Policy No. 000010030695
        Claim No.  1020005103

<u>VIA OVERNIGHT MAIL</u>

## REQUEST FOR  REVIEW OF CLAIM DENIAL

Dear Sir or Madam:

I am the attorney representing Sandra Wiesner on the above claim for Long Term Disability benefits which was denied after review on August 2, 2002.  This letter is submitted as Ms. Wiesner's second-level appeal of such claim denial.  The denial is in error because it is not supported by any substantial medical or vocational evidence and it is contrary to all the medical and vocational evidence of record as to the diagnosis of fibromayalgia and its disabling cognitive and physical effects.

## STATEMENT OF THE CLAIM

Ms. Wiesner was employed as a kindergarten teacher by the Falmouth Public School system.  Over a period of several years, Ms. Wiesner began to suffer progressive symptoms of chronic fatigue, weakness, low stamina, sleep disturbance and cognitive impairment.  Ms. Wiesner's cognitive impairments included loss of concentration, short term memory loss, difficulty retaining new information and aphasia.   Her physical symptoms included dizziness, muscle pain, chronic headaches and increased suscept-ibility to infection.

By January 31, 2001, these multiple symptoms became so severe that Ms. Wiesner could no longer perform the duties of a kindergarten teacher.  She stopped working at that time, taking a leave of absence while still enrolled as an employee of the Falmouth public school system.

By December 2001, it became apparent that Ms. Wiesner would most likely not recover the ability to perform the duties of a public school teacher and she then filed her claim for long term disability benefits under the Falmouth School Department's ERISA plan with Jefferson Pilot Financial. On 12/18/01, Ms. Wiesner submitted her Long Term Disability Claim Employee's Statement on the form provided by Jefferson Pilot Financial. This statement should already be part of the claim file. I am enclosing a copy (four pages including attachments) and I ask that it be included in the claim file and be made part of the record on this appeal.

As appears on Ms. Wiesner's statement, the basis of her disability is not depression or any other affective disorder. Ms. Wiesner has a long history of treatment for depression which did not prevent her from performing the duties of a public school teacher. In her statement, Ms. Wiesner mentions "increased depression" once, as just one of many symptoms she was experiencing. But, in functional terms, she mentions only her cognitive and physical problems as preventing her from continuing to work.

This disability claim is thus clearly based on a combination of physical and cognitive impairments, and not on a "mental sickness" as defined in the policy. Although Ms. Wiesner has incurred some increased depression, due to the severity of her physical and cognitive problems, the claim is "primarily based" on the physical and cognitive impairments and not on her depression or any other "mental sickness." For this reason the Specified Injuries Or Sickness Limitation stated in the policy does not apply to this claim.

The specific diagnosis from which Ms. Wiesner's symptoms derive is fibromyalgia. This is clearly stated by Dr. Molloy whose report of 9/26/01 expressly states that Ms. Wiesner "meets all of the published diagnostic criteria for fibromyalgia syndrome." The LTD Claim Physician's Statement submitted by Ms. Peters-Gilmartin for Mashpee Medical on 12/17/01 states the primary diagnosis on which disability is based as "Fibromyalgia Syndrome." Depression is listed below on the form as a "secondary condition."

Fibromyalgia is an illness that involves multiple physical symptoms and severe cognitive impairments. These were documented on the report submitted from Joan Peters-Gilmartin dated 6/6/02 (two pages) and the Fibromyalgia Residual Functional Questionnaire completed by Ms. Peters-Gilmartin dated 6/6/02 (five pages). These were both submitted with my letter of July 2, 2002, and should already be part of the claim file. I am enclosing additional copies of these documents and I request that they be included in the record on this appeal.

**Ms. Wiesner claims that by reason of progressive symptoms related to fibromyalgia syndrome, as diagnosed by Dr. Molloy and Dr. Silva, and as documented by the substantial evidence submitted on this claim, she is no longer able to work as a public school teacher or at any other gainful occupation which her training, education or experience would reasonably allow, and she is therefore "totally disabled" within the meaning of the long term disability plan.**

The policy requires that a disability claimant apply for other income benefits, including Social Security benefits, to which she may be "entitled" based on the same disability for which benefits are claimed under the policy. Ms. Wiesner has not applied for any SSDI or SSI benefits because she is not eligible for such benefits based on her earnings record and her resources. I enclose a copy of Ms Wiesner's <u>Social Security Statement</u> dated October 16, 2001, and I request that it be included in the claim file as part of the record on appeal.

This <u>Statement</u> documents the fact that Ms. Wiesner, while employed for the years 1990 through 2000 in the public sector as a teacher, has no private-sector earnings to make her eligible for Social Security Disability benefits. Ms. Wiesner also possesses assets which make her ineligible for Supplemental Security Income. For these reasons Ms. Wiesner is not required to apply for any Social Security benefits related to her disability, as she is not "entitled" to any such benefits within the meaning of the policy.. This disqualification is based solely on Ms. Wiesner's earnings record and assets and is not based on any medical or vocational issue relating to her disability.

## DOCUMENTS PREVIOUSLY SUBMITTED

The following documents have been submitted previously to Jefferson Pilot Financial in support of Ms. Wiesner's long term disability claim.

### Documents Submitted With Letter of May 21, 2002

<u>Dr. Molloy</u>
Report  (9/26/01)                                        1 page
Office Notes   (9/26/01 –5/6/02)                         4 pages

<u>Dictionary of Occupational Titles</u>

Excerpts from 4th Edition (1991)
Re. definition of Kindergarten Teacher
and Appendices B & C                                    12 pages

## Documents Submitted With Letter of July 2, 2002

<u>Mashpee Medical</u>
J. Peters Gilmartin
Narrative (6/6/02) with Attachment                       4 pages

Fibromyalgia Residual Function
Questionnaire (6/6/02) with Attached
Referrals and Lab Reports                               29 pages

Office Notes
(10/26/96 – 5/7/02)                                     42 pages

Dr. Felsenstein
Narrative (2/8/02)                                                          3 pages

Dr. Mase
Letter (8/8/01)                                                            1 page

Falmouth Hospital
Outpatient Record (12/8/97)                                               1 page

Dr. Litterer
Office Note (12/11/97)                                                     1 page

Dr. Frizzell
Office Note (12/16/97)                                                     1 page

Cote & Moldofsky
*Sleep, Daytime Symptoms & Cognitive*
*Performance in Patients with Fibromyalgia,*
Journal of Rheumatology 1997 (24:10)                       Pages 2014-2023

Park, Glass, Minear and Crawford
*Cognitive Function in Fibromyalgia Patients*
Arthritis & Rheumatism. Vol. 44, No. 9, Sept. 2001      Pages 2125-2133

Glass & Park
*Cognitive Dysfunction in Fibromyalgia*
Current Rheumatology Reports, 2001                        Pages 3:123-3:127

Aaron, Burke & Buchwald
*Overlapping Conditions Among Patients with*
*Chronic Fatigue Syndrom, Fibromyalgia and*
*Temperomandibular Disorder*
Archives of Internal Medicine, Vol. 160 (Jan. 24, 2000)    Pages  221 - 227

The above documents, together with my letters of May 21, 2002 and July 2, 2002, were
submitted in support of Ms. Wiesner's claim for long term disability benefits and should
be part of the record on appeal.

If any of the above materials is not in the claim file given to you for review,
please notify me and additional copies will be submitted.  If you do not notify me as to
any missing documentation, I will assume they are all in the file as listed above for
purposes of this appeal and any subsequent appeal to federal court.

## DOCUMENTS SUBMITTED WITH THIS APPEAL

The following documents are submitted with this letter to be made part of the claim file and record on appeal:

| | |
|---|---|
| Mashpee Medical<br>Narrative of June 6, 2002<br>Endorsed by George J. Silva, MD | 2 pages |
| Office Notes<br>(7/15/02 – 1/7/03) | 6 pages |
| LTD Claim Physician's Statement<br>(12/17/01) | 2 pages |
| Dr. Molloy/ Rheumatology Associates<br>Office Notes<br>(6/3/02 – 1/6/03) | 4 pages |
| Dr. Cobb<br>Consultation Report (7/26/02) | 2 pages |
| Falmouth Hospital<br>EGD Diagnostic Report (8/6/02) | 2 pages |
| Dr. Brake<br>Consultation Reports<br>(8/26/02 & 12/17/02) | 2 pages |
| Supt. Peter Clark/ Falmouth Public Schools<br>Letter (1/22/03) | 1 page |
| Social Security Administration<br>Social Security Statement (10/16/91) | 4 pages |
| Sandra Wiesner<br>LTD Claim Employees Statement (1/31/01)<br>With Attachments & Med. Authorization | 5 pages |

If any of the above are not located in the file when you review it, please notify me and additional copies will be provided. If you do not notify me as to any missing documentation, I will assume that all of the above are included in the record for this appeal and any subsequent appeal to federal court.

## DISCUSSION OF DISABILITY ISSUES

Letters submitted to Jefferson Pilot Financial on May 21, 2002, and July 2, 2002, discussed in detail why the denial of long term disability benefits was in error. Copies of those letters are submitted as an attachment to this letter and are hereby incorporated by reference into this appeal.

The letter of May 21, 2002, states that Ms. Wiesner has at all times relevant to the claim been under the care of Dr. Silva and Dr. Molloy for treatment of fibromyalgia. This was documented by Dr. Molloy's records submitted at that time and by records from Mashpee Medical submitted with the letter of July 2, 2002. The further records from Dr. Molloy and Mashpee Medical enclosed with this letter document the fact that Ms. Wiesner continues with active treatment for fibromyalgia. This appears on Dr. Molloy's note of January 6, 2003, and the Mashpee Medical record of January 7, 2003. The record thus shows an unbroken course of treatment for fibromyalgia with either or both of these providers at all times since the diagnosis was made by Dr. Molloy on September 26, 2001.

Fibromyalgia, not depression or any other "mental sickness," is the primary basis for Ms. Wiesner's disability. This is expressly stated on the LTD Claim Physician's Statement of 12/17/01. Ms. Wiesner has been employed as a public school teacher since 1984, all the while suffering from chronic depression related to childhood sexual abuse. This is documented by the Mashpee Medical record of 5/3/01, which notes that Ms. Wiesner has always coped with that problem and her present increased depression is related to her chronic/recurrent fatigue and body symptoms.

The letter of May 21, 2002, enclosed copies of the DOT definition of kindergarten teacher which clearly estblishes that the denial of benefits as to "own occpation" disability was clearly in error. The DOT definition describes the job as it exists in the national workforce, and therefore it conforms to the policy definition of "own occupation" disability.

Ms. Wiesner's disability from working as a teacher is also confirmed by the letter of 1/22/03 from Falmouth School Superintendant Peter Clark who refers to the findings by Dr. Silva/ Ms. Peters-Gilmartin as to fatigue, painful movement and slowness of judgment and reactions and states that those factors would prevent anyone from performing the work of a kindergarten teacher. Dr. Clark adds that, although he cannot make a medical judgment as to their cause, such impairments were evident in Ms. Wiesner's actual job performance and were in fact the cause of concern about her ability to continue teaching. Dr. Clark's description of the duties of a kindergarten teacher are consistent with the DOT definition.

The letter of July 2, 2002, enclosed several recent articles from recognized medical journals about the disabling effects of fibromyalgia, including cognitive impairments. These articles support Dr. Molloy's diagnosis and his observation that Ms. Wiesner meets all of the published diagnostic criteria for the diagnosis of fibromayalgia.

The letter of July 2, 2002, also enclosed a fibromyalgia residual function questionnaire completed by Ms. Peters/ Gilmartin which outlines in specific detail the several physical and cognitive impairments which Ms. Wiesner suffers by reason of her fibromyalgia. Such impairments are summarized in the June 6, 2002, narrative by Ms. Peters/ Gilmartin which has been endorsed by Dr. Silva. Again, these are fully consistent with the published criteria for the diagnosis and they clearly establish that Ms. Wiesner is not capable of performing any gainful occupation for which she might otherwise be qualified by education, training and experience.

As stated in the June 6, 2002, narrative, and as expanded upon in the residual function questionnaire, Ms. Wiesner suffers "complicating and multiple symptoms" of fibromyalgia including:

--vestibular dysfunction, which causes dizziness

--cognitive impairments, including frequent interference with attention and concentration

--in-coordination, numbness and tingling, weakness

--multi-site myalgias and stiffness

--headache

--chronic fatigue

--limited endurance for sustained activity

--side effects of medication including drowsiness

Depression is also listed as just one of these many symptoms. And Ms. Wiesner's condition is further complicated compromised immune systems which make her highly susceptible to infectious illness.

By reason of these symptoms, Ms. Wiesner has the following specific functional limitations:

--limited walking due to pain, three city blocks maximum

--sitting limited to two hours maximum

--standing, walking limited to two hours maximum

--must lie down at unpredictable intervals

--need to elevate legs with prolonged sitting

--lifting limited to 10 lbs. maximum, occasional only

--no lifting twenty lbs. or more

--difficulty reaching, handling, fingering objects

The substantial medical evidence of record, including the diagnoses and findings of Ms. Wiesner's two principal treating physicians, Dr. Silva and Dr. Molloy, substantiate such level of both physical and cognitive impairment

The denial of benefits, as stated in Jefferson Pilot Financial's notice of August 2, 2002, is clearly in error. That denial recognizes that the records show treatment for fibromyalgia, but then concludes "these records fail to show substantial evidence that Ms. Wiesner's condition would have prevented her from performing her occupation." That finding is clearly in error.

The reports and conclusions of a claimant's treating physicians are always accorded weight as substantial evidence on an ERISA claim for long term disability benefits. Therefore, the denial of benefits as based on a finding that the records "fail to show substantial evidence" that Ms. Wiesner's suffers from a disabling condition is plainly wrong. Ms. Wiesner's treating physician states flatly that she cannot perform her job as a kindergarten teacher, based on physical and cognitive impairments that are specifically related to a well-diagnosed illness. That is substantial medical evidence of disability in this case, and there is no contrary substantial medical evidence.

Moreover, the fact of Ms. Wiesner's disability from her teaching job is fully supported by the statement of Dr. Peter Clark, the Falmouth School superintendant who describes how Ms. Wiesner's symptoms prevented her from performing her job as a teacher.

Ms. Wiesner is further disabled from performing any other gainful occupation for which she might be reasonably qualified by her education, training or experience. The direct effects of Ms. Wiesner's illness, as described by her treating physician, include multiple arthralgias which significantly restrict her physical activity to less than a full range of sedentary work, e.g. with a limitation on sitting to no more than 2 hours at a time and lifting up to 10 lbs. maximum only occasionally.

Ms. Wiesner's physical impairments are significantly compounded by fatigue and by cognitive impairments which compromise her ability to concentrate and short term memory. Further, the substantial medical evidence establishes that Ms. Wiesner takes medications for treatment of fibromyalgia which cause drowsiness. The residual function assessment also states that Ms. Wiesner's illness would cause her to be absent from any job more than once a week.

Based on the restrictions outlined on the residual function questionnaire, and in the Mashpee Medical report of June 6, 1992, to be gainfully employed Ms. Wiesner would need job on which she could sit, stand or lie down frequently and at unpredictable intervals. It would be a job that required no more than 10 lbs. lifting, and that only on an occasional basis, with no lifting up to 20 lbs. She would need a job at which she would not have to concentrate or assimilate any new information. She would need a job which would permit her to take naps as needed during the work day. She would need a job which involved no exposure to normal work stress and which would not expose her to people with colds and flu.

The substantial medical evidence establishes that Ms. Wiesner suffers from such limitations due to illness, and there is no substantial medical evidence to the contrary. Dr. Sigsbee's report does not contradict the diagnosis of fibromyalgia, as he did not consider it and the diagnosis was made by Dr. Molloy and Dr. Silva after Dr. Sigsbee saw Ms. Wiesner. In any event, Dr. Sigsbee diagnoses severe depression which would prevent Ms. Wiesner from working at any occupation. And depression is a secondary diagnosis as made by Dr. Silva.

With no contrary substantial medical evidence on an ERISA disability claim, the plan administrator and/or claims administrator cannot just disregard the findings of an employee's treating physicians as to disability based on a well-diagnosed illness. To deny a claim on that basis is by definition arbitrary and capricious. The substantial medical evidence in this case establishes that Ms. Wiesner suffers severe symptoms from fibromyalgia as diagnosed by Dr. Molloy, Dr. Silva. And the medical evidence establishes that the diagnosis of fibromyalgia is the cause of Ms. Wiesner's disabling impairments.

And it is clear that such impairments prevent Ms. Wiesner from working at any gainful occupation because there are no jobs in the national economy which would accommodate such limitations. There is no job which allows a worker to sit, stand or lie down at will at unpredictable intervals, which permits the worker to take naps as needed, which allows the worker to take soporific medications on the job, which does not require concentration and attention and which allows for frequent absenteeism.

To support the claim denial in this case, there must be either substantial evidence which (a) medically contradicts the diagnosis of fibromyalgia, (b) medically contradicts the severity and frequency of Ms. Wiesner's symptoms, (c) vocationally contradicts the assessment by Mashpee Medical and Dr. Clark that Ms. Wiesner's symptoms prevent her from working as a teacher and/or (d) vocationally establishes that there are gainful occupations which Ms. Wiesner can perform within the limitations described by Dr. Silva and Ms. Peters Gilmartin. In the absence of any such substantial evidence contrary to the evidence submitted by Ms. Wiesner, the denial of benefits is arbitrary and capricious and cannot be upheld.

## CONCLUSION:DEMAND FOR RELIEF

Based on the foregoing, we demand that the denial of benefits on this ERISA claim be reversed, with a determination that Ms. Wiesner is totally disabled within the meaning of the plan and that she be awarded long term disability benefits accordingly, from January 31, 2001, and continuing through her 65th birthday.

If the claim file contains any evidence contrary to the evidence submitted by Ms. Wiesner as to the diagnosis of fibromyalgia, as to its symptoms, as to the disabling effects of such symptoms and/or as to the availability of any jobs which would accommodate Ms. Wiesner's limitations as stated by Mashpee Medical, such evidence should have been specifically cited in the claim denial of August 2, 2002. And if any such record evidence exists, I expressly request that you provide copies to me by return mail and provide me with an opportunity for further comment.

For Sandra Wiesner
By her Attorney

Richard K. Latimer